**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEIZURE WARRANT**

I, Andrew Snow, having being duly sworn, depose and state as follows:

**I.      BACKGROUND OF AFFIANT**

1.      I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since March 2016. I am currently assigned to the DEA High Intensity Drug Trafficking Area ("HIDTA") Task Force in Worcester, Massachusetts. Prior to my assignment to the Worcester HIDTA Task Force, I completed the twenty-week DEA Basic Agent training academy in Quantico, Virginia, during which I successfully completed the requirements for graduation and was extensively trained in the investigation and enforcement of narcotics violations. Prior to my employment with the DEA, I was a police officer in Glocester, Rhode Island and East Providence, Rhode Island for a total of eight years, where I made numerous narcotics related arrests. During the course of my employment in law enforcement, I have received specialized training regarding the activities of narcotics traffickers and various aspects of narcotics investigation, including the methods used to (a) package, transport, and store and distribute narcotics; and (b) conceal and launder the proceeds of narcotics trafficking.

2.      In addition to my law enforcement training, I have experience investigating narcotics traffickers. I have participated in numerous narcotics investigations both as a Special Agent as well as a police officer, during which I have conducted physical surveillance, utilized confidential informants, executed arrest and search and seizure warrants, and conducted court-authorized electronic surveillance. I have testified at trials and hearings in federal, state, and municipal courts.

3.      Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds. I am also familiar with

the manner in which narcotics traffickers often use their personal residences to distribute drugs, store drugs, collect drug debts, and store drug proceeds.

4. The information in this affidavit is based upon information gathered during the course of my investigation, including: information provided by other federal agents and law enforcement officers, investigators, and witnesses; controlled purchases of narcotics from William T. Hoey ("HOEY"); documents, including bank and other financial records; public records checks; an interview with HOEY; and my training and experience as a federal law enforcement agent.

5. This affidavit is submitted for the limited purpose of showing that there is sufficient probable cause for the requested seizure warrant, and as such, it does not include each and every fact that I know about this investigation. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance only.

## II. SUBJECT PROPERTY

6. This affidavit is submitted in support of an application for a seizure warrant for the following property:

    a. All funds on deposit in account 1000668548, held in the name of William J. Hoey at Leominster Credit Union (the "TARGET FUNDS").

The requested warrant seeks seizure of the TARGET FUNDS, which is property that constitutes or is traceable to proceeds of a specified unlawful activity—namely, HOEY's drug trafficking activities—and were involved in transactions in violation of 18 U.S.C. §§ 1956 and 1957.

## III. RELEVANT STATUTES AND JURISDICTION

7. Pursuant to 18 U.S.C. § 1956(a)(1)(B)(i), it is a federal crime to, "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conduct[] or attempt[] to conduct such a financial transaction which in fact involves the

proceeds of specified unlawful activity . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."

8. Pursuant to 18 U.S.C. § 1957, it is a federal crime to knowingly engage or attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and that is derived from specified unlawful activity. 18 U.S.C. § 1957(a).

9. Distribution of controlled substances, including cocaine, in violation of 21 U.S.C. § 841 is a "specified unlawful activity" for purposes of 18 U.S.C. §§ 1956 and 1957. *See* 18 U.S.C. §§ 1957(f)(3) and 1956(c)(7)(B)(i). The term "criminally derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense, which includes a specified unlawful activity. 18 U.S.C. § 1957(f)(2).

10. For purposes of 18 U.S.C. § 1957(a), the term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a "monetary instrument" by, through, or to a "financial institution," including transactions that would be a "financial transaction" under 18 U.S.C. § 1956(c)(4)(B). 18 U.S.C. § 1957(f)(1). Pursuant to 18 U.S.C. § 1956(c)(4)(B), the term financial transaction includes "a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree."

11. "Monetary instrument" is defined broadly to include United States currency, personal checks, bank checks, and negotiable instruments. *See* 18 U.S.C. §§ 1957(f)(1) and 1956(c)(5). "Financial institution" is defined to include FDIC-insured banks. *See* 18 U.S.C. §§ 1957(f)(1) and 1956(c)(6)(A); 31 U.S.C. § 5312(a)(2)(A).

12. Any property, real or personal, involved in a money laundering offense in violation of 18 U.S.C. §§ 1956 or 1957, and any property traceable to such property, is subject to criminal

forfeiture to the United States. *See* 18 U.S.C. § 982(a)(1). Additionally, any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 or 1957, and any property traceable to such property, is subject to civil forfeiture to the United States. 18 U.S.C. § 981(a)(1)(A).

13. When a civil forfeiture proceeding involves "funds deposited in an account in a financial institution, . . . it [is] not necessary for the Government to identify the specific property involved in the offense; and . . it [is] not a defense that the property involved in such an offense has been removed and replaced by identical property" as long as the proceeding commences within one year of the date of the offense. 18 U.S.C. § 984(a)(1).

14. This Court has authority to issue the requested seizure warrant pursuant to 18 U.S.C. § 981(b)(3), which provides "a [civil] seizure warrant may be issued . . . by a judicial officer in any district in which a forfeiture action against the property may be filed under [28 U.S.C. § 1355], and may be executed in any district in which the property is found." Here, pursuant to 28 U.S.C. § 1355(b)(1)(A), this Court has jurisdiction over forfeiture proceedings because the acts or omissions giving rise to the forfeiture occurred in the District of Massachusetts.

15. This Court also has authority to issue the requested warrant pursuant to 21 U.S.C. § 853(f), as incorporated by 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c), which provides that the "Government may request the issuance of a [criminal] warrant authorizing the seizure of property subject to forfeiture under this section in the same manner as provided for a search warrant. If the court determines that there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture and that [a protective] order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the property for forfeiture, the court shall issue a warrant authorizing the seizure of such property." Here, a protective order

is insufficient because I know that restraining orders served on banks sometimes fail to preserve the property for forfeiture because, despite the best intentions of a financial institution, restrained funds are occasionally released, transferred or otherwise dissipated. In contrast, a seizure warrant guarantees that the funds will be transferred to, and held securely in, the Government's custody once the warrant is served.

### IV. PROBABLE CAUSE

16. For the reasons set forth in this affidavit, I submit that there is probable cause that the TARGET FUNDS are subject to forfeiture to the United States pursuant to 18 U.S.C. § 982(a)(1) and 18 U.S.C. § 981(a)(1)(A) because they constitute, or are traceable to, property involved in money laundering offenses in violation of 18 U.S.C. §§ 1956 and 1957.

17. On October 24, 2019, HOEY withdrew more than $100,000 in cash from two bank accounts held in his name at TD Bank. On the same day, HOEY used that cash to purchase several official checks from TD Bank, including a TD Bank Official Check ("TD CHECK 3451-7") in the amount of $87,180.82, made payable to his father William J. Hoey. Of the more than $100,000 in cash that HOEY withdrew on that day and which he used to purchase the TD CHECK 3451-7, more than $10,000 is traceable to the proceeds of HOEY's drug trafficking activities.

18. On March 24, 2020, according to information provided by TD Bank, HOEY went to a TD Bank branch in Worcester, Massachusetts and requested that the TD CHECK 3451-7 be voided. HOEY, while at the same TD Bank branch, then used the funds from TD CHECK 3451-7 and requested a new official check in the same amount, $87,180.82, also made payable to his father, William J. Hoey ("TD CHECK 5594-3").[1] That same day, TD CHECK 5594-3 was

---

[1] I believe that HOEY is who conducted these transactions because TD Bank advised that the identification presented for these transactions was a Massachusetts Driver's License ending in

deposited into account 1000668548 held in the name of William J. Hoey at Leominster Credit Union ("the Leominster Account 8548"), the account holding the TARGET FUNDS.

19. HOEY's use of more than $10,000 of drug proceeds to purchase the TD CHECK 5594-3 was a monetary transaction of more than $10,000 in proceeds of a specified unlawful activity—namely, drug trafficking, in violation of 18 U.S.C. § 1957. Additionally, the subsequent <u>deposit</u> of that check into the Leominster Account 8548 was both an additional violation of 18 U.S.C. § 1957, and also a financial transaction designed to conceal the nature, source, location, and ownership of the TARGET FUNDS, including the approximately $87,000 from the TD CHECK 5594-3. Both of these transactions affected interstate commerce because TD Bank is FDIC-insured and headquartered in Cherry Hill, New Jersey, and its activities therefore affect interstate commerce. As a result, probable cause exists to believe that these transactions are in violation of both 18 U.S.C. §§ 1956 and 1957 and that all of the funds held on deposit in the Leominster Account 8548 (the TARGET FUNDS) are subject to seizure and forfeiture.

### A. HOEY's Specified Unlawful Activity: Drug Trafficking

20. On October 18, 2019, this Court issued search warrants for HOEY's residence, 30 Shady Lane, Holden, Massachusetts, and for HOEY's car, an Audi Q7. *See* Case Nos. 19-mj-4513 and 19-mj-4514. The affidavit submitted in support of those search warrants, which is incorporated herein by reference and attached as <u>Exhibit 1</u>, further describes HOEY's drug trafficking activities between January and October 2019, including three controlled purchases of cocaine from him in the District of Massachusetts. See <u>Exhibit 1</u>, at ¶¶ 11-26.

---

2022. I know through the investigation that HOEY's Massachusetts Driver's License ends in 2022.

21. On October 22, 2019, agents conducted a traffic stop of HOEY's car. HOEY consented to a search of his car, from which agents seized a loaded firearm and approximately 500 grams of a substance that later tested positive for the presence of cocaine.

22. On October 22, 2019, agents also executed the search warrant at HOEY's residence, where agents seized approximately 835 grams of a substance that later tested positive for the presence of cocaine and agents further seized two more loaded firearms.

23. On November 21, 2019, HOEY was indicted in a seven-count indictment (the "Indictment") for distribution of and possession with intent to distribute a controlled substance, cocaine, in violation of 21 U.S.C. § 841(a)(1) (Counts 1-3); possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) (Count 4); possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(ii)) (Count 5); Using and Carrying a Firearm During and in Relation to, and Possessing a Firearm in Furtherance of, a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 6); and Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 7). *See* Docket No. 19-cr-40052-TSH.

### B. HOEY's Drug Trafficking Income

24. HOEY was arrested and taken into custody on October 22, 2019. Prior to his arrest, HOEY voluntarily spoke with law enforcement agents about his cocaine trafficking activities and income, and his relatively minimal income from legitimate employment.

25. HOEY admitted that his relationship with his then-current cocaine supplier began approximately three years ago, and that he purchased cocaine for approximately $31,000 per kilogram, sold it for between $35 to $36 per gram, and sold approximately one to two kilograms of cocaine per month. Based on his own admissions, I estimate that HOEY made a profit of

between $4,000 to $5,000 per kilogram of cocaine that he sold. If HOEY sold one kilogram of cocaine per month, his annual income would have been between $48,000 and $60,000. If he sold two kilograms per month, his annual income would have been between $96,000 and $120,000.

26.     As discussed below, during the period of time in which HOEY stated he maintained a relationship with his current cocaine supplier, HOEY deposited approximately $131,000 of cash into his personal checking account at Santander Bank between February 2016 and October 2019. I have probable cause to believe that this cash is proceeds of HOEY's cocaine trafficking activities.

### C. HOEY's Substantial Cash Deposits Are Unexplained By Legitimate Income

27.     During his interview, HOEY informed agents that he had not received an IRS Form W-2 from an employer since approximately 2012. HOEY said that he claimed approximately $15,000 per year in income on his federal income tax returns in 2016, 2017, and 2018, and that this reported income was from services he provided as a personal fitness trainer. HOEY added that he had not earned any income from personal training during 2019. HOEY also said that he uses drug proceeds to pay for daily expenses, such as payments on his car loan and personal expenses like clothing.

28.     I obtained copies of HOEY's personal federal income tax returns for 2016, 2017, and 2018 from the Internal Revenue Service pursuant to a court order obtained under 26 U.S.C. § 6103(i). HOEY's tax returns reflect that he received relatively minimal income from legitimate employment. For these three years, HOEY did not report any W-2 income, and the only income he did report was on a Schedule C, which is used to report income or loss from self-employment. HOEY reported the following Schedule C income: $17,765 in 2016; $16,325 in 2017; and $20,165 in 2018. HOEY's 2018 Schedule C also reported $5,500 in gross receipts from real estate investments, with a claimed profit of only $3.00. As discussed further below, HOEY's reported

income is considerably less than the aggregated cash deposits that he made to his personal checking account at Santander Bank between 2016 and 2019.

29. During this investigation, I reviewed bank and other financial institution records for accounts controlled by HOEY, including records from Santander Bank, TD Ameritrade, and TD Bank. These records show that between February 2016 and October 2019 (the "Review Period"), HOEY deposited approximately $131,000 of suspected drug proceeds in cash, through a total of 63 deposits, into account #######2734, a checking account held in his name at Santander Bank ("Santander Account 2734").

30. Based on my training and experience, I know that transactions involving illegal narcotics like cocaine are typically conducted in cash. In addition, during this investigation law enforcement conducted at least three controlled purchases of cocaine from HOEY and each of those transactions was conducted in cash.

31. I also compared HOEY's cash deposits into the Santander Account 2734 with HOEY's Schedule C forms from 2016, 2017, and 2018. I determined that HOEY deposited substantially more cash into the Santander Account 2734 than he reported in income for each of those years, for a total of more than $61,000 over those three years. These figures are summarized in the table below:

| Year | Schedule C Reported Income (Including Expenses) | Cash Deposited into Santander Account 2734 | Amount of Cash Deposits Exceeding Reported Income |
|---|---|---|---|
| 2016 | $16,885 | $47,560 | $23,435 |
| 2017 | $16,325 | $34,192 | $17,867 |
| 2018 | $20,165 | $33,538.43 | $13,373.43 |
| **Total:** | **$53,375** | **$115,290.43** | **$61,915.43** |

32. Additionally, HOEY deposited more than $20,000 in cash into the Santander Account 2734 in 2019. Although federal income tax returns are not yet available for 2019, HOEY informed agents that he did not earn any income from personal training during 2019.

33. In sum, HOEY deposited approximately $131,000 in cash between February 2016 and October 2019, during which time law enforcement agents have learned that he was involved in substantial drug trafficking activities. Based on the information I have learned during this investigation, I am not aware of any other legitimate sources of income that could account for HOEY's substantial cash deposits. For these reasons, and based on my training and experience, I have probable cause to believe that the $131,000 in cash deposits are the proceeds of HOEY's drug trafficking activities.

### D. HOEY's Transfers of Drug Proceeds

34. After depositing his drug proceeds into the Santander Account 2734, HOEY transferred these funds to and through multiple other accounts held in his name. This included a total of $51,750 that HOEY transferred from the Santander Account 2734 to account #####1248, a checking account held in HOEY's name at TD Bank ("TD Account 1248"), from which HOEY withdrew more than $66,000 in cash that he used to purchase the TD CHECK 3451-7.

35. *First*, between October 6, 2016 and November 4, 2016, HOEY deposited $25,000 in cash into the Santander Account 2734 in five deposits of $5,000 each. Within days after making each of those five cash deposits, HOEY then made five separate transfers of $5,000 each from the Santander Account 2734 to account ###-##4790, a retirement account held in HOEY's name at TD Ameritrade ("TD Ameritrade Account 4790"). Then, on November 18, 2016, HOEY transferred $25,000 from the TD Ameritrade Account 4790 to account ###-##5882, another retirement account held in his name at TD Ameritrade ("TD Ameritrade Account 5882"). Thus,

in a period of less than two months, HOEY integrated $25,000 in drug proceeds into the financial system and transferred it to and through two retirement accounts held in his name.

36. ***Second***, between December 2016 and September 2018, HOEY deposited approximately $56,202 in cash into the Santander Account 2734. During the same time period, HOEY also transferred approximately $26,750 from the Santander Account 2734 to the TD Ameritrade Account 5882.

37. Accordingly, I believe that between November 2016 and September 2018, HOEY transferred approximately $51,750 in drug proceeds—including $25,000 in November 2016 and an aggregate of $26,750 between December 2016 and September 2018—from the Santander Account 2734 to the TD Ameritrade Account 5882.

### i. Purchase of the TD CHECK 3451-7

38. On January 3, 2019, HOEY transferred $55,764.45 from the TD Ameritrade Account 5882 to the TD Account 1248. Those funds were deposited into the TD Account 1248 on January 4, 2019.

39. On October 24, 2019, two days after his arrest, HOEY withdrew $107,439.32 in cash from two accounts at TD Bank's branch in Greendale, Massachusetts, including: (1) $66,103.98 from the TD Account 1248 and (2) $41,335.34 in cash from account #####1115 ("TD Account 1115"), a business checking account that HOEY opened in the name of REI Construction Services, and for which HOEY has sole signatory authority.[2]

---

[2] The Government is not alleging that account #1115 is a basis for the seizure of the TARGET FUNDS, but includes this information to provide a complete picture of the funds used to purchase the TD CHECK 3451-7.

40. Also on October 24, 2019, HOEY used the withdrawn cash to purchase six official checks in various amounts at the same TD Bank branch in Greendale. The largest of these checks was the TD CHECK 3451-7 in the amount of $87,180.82 that was made payable to HOEY's father.

41. From January 4, 2019—the date that HOEY transferred $55,764.45 into the TD Account 1248 from the TD Ameritrade Account 5882—to March 26, 2019, there were three withdrawals totaling $60,000 from the TD Account 1248, and each of these were transfers to the TD Account 1115. During the same date range, a total of $33,371.39 was deposited into the TD Account 1248 from various sources. From January 4, 2019, through March 26, 2019, the balance of the TD Account 1248 never dropped below $10,000.01.[3] Therefore, regardless of the withdrawals from the TD Account 1248, there were still funds traceable to drug proceeds in excess of $10,000 in the TD Account 1248 throughout the Review Period.

42. Therefore, at least $10,000 of the funds that HOEY used to purchase the TD CHECK 3451-7, are traceable to HOEY's drug trafficking activities: HOEY deposited more than $131,000 of cash constituting drug proceeds into the Santander Account 2734; he transferred a total of $51,750 from the Santander Account 2734 to the TD Ameritrade Account 5882 (including the transfer of $25,000 through the TD Ameritrade Account 4790 and direct transfers totaling $26,750); he then transferred $55,764.45 from the TD Ameritrade Account 5882 to the TD Account 1248; and, finally, he withdrew $66,103.98 from the TD Account 1248 which, along with funds from the TD Account 1115, composed the funds that HOEY used to purchase the TD CHECK 3451-7.

---

[3] Between January 4, 2019 and October 24, 2019, the date the cash used to purchase CHECK 3451-7 was withdrawn, the balance of the TD Account 1248 was never below $10,000.01.

### ii. *Cancellation of TD CHECK 3451-7 and Issuance of TD CHECK 5594-3*

43.     Although the TD CHECK 3451-7 was issued on October 24, 2019, it was not deposited or otherwise negotiated for approximately five months. Then, on March 24, 2020, according to information from TD Bank, HOEY requested that TD Bank void TD CHECK 3451-7 and further requested that TD Bank issue a new official check, TD CHECK 5594-3, in the same amount of $87,180.82, and again made payable to William J. Hoey. TD Bank records reflect that on March 24, 2020, the TD CHECK 5594-3 was deposited into the Leominster Account 8548.

44.     Probable cause exists to believe that HOEY established and utilizes the Leominster Account 8548, opened shortly after his arrest in his father's name, to hide the source of, and the true ownership and control of, the funds in that account. The Leominster Account 8548 was opened within a week of HOEY's arrest on October 22, 2019. More specifically, on October 29, 2019, HOEY's father, William J. Hoey, opened the Leominster Account 8548. Five days earlier, on October 25, 2019, HOEY requested that TD Ameritrade issue a check in the amount of $80,400 from account ######4790 held in his name at TD Ameritrade, made payable to his father ("TD AMERITRADE CHECK 15880635"). On October 29, 2019, William J. Hoey deposited $80,375 of the TD AMERITRADE CHECK 15880635 into the Leominster Account 8548.[4] The Leominster Account 8548 appears to be funded almost exclusively by HOEY and as detailed below, many of the transactions appear to be similar to those conducted by HOEY from the Santander Account 2734 (held in his name) prior to his arrest. The only known contribution other

---

[4] Leominster Credit Union requires customers to open a corresponding savings account when they open a checking account. Upon opening the savings account, also on October 29, 2019, William J. Hoey deposited $25 of the TD Ameritrade Check 15880635 into the savings account, leaving a balance of $80,375 which was deposited into the Leominster Account 8548.

13

than TD CHECK 5594-3 and TD AMERITRADE CHECK 15880635 to the Leominster Account 8548 was a cash deposit made on January 8, 2020, in the amount of $2,404.73. Although the account is in his father's name, it appears many of the transactions are for HOEY's benefit.[5] Examples of transactions utilizing the Leominster Account 5848 that I believe are for HOEY's benefit are below:

  a. Records for the Leominster Account 5848 show: on November 4, 2019, a check in the amount of $10,240, made payable to Kidoodles; on January 26, 2020, a check in the amount of $1,400, made payable to Kidoodles; and on February 24, 2020, a check in the amount of $1,422, made payable to Kidoodles. Records for the Santander Account 2734 show: on July 23, 2019, a check in the amount of $275 made payable to Kidoodles; and on January 17, 2020, a check in the amount of $170 made payable to Kidoodles.

  b. On November 12, 2019, a check in the amount of $12,500 from the Leominster Account 5848 made payable to James Gribouski. HOEY retained James Gribouski as his attorney following his arrest on October 22, 2019.

  c. On January 28, 2020, two checks written from Leominster Account 8548 directly to HOEY, one on in the amount of $1,500 and one in the amount of $500.

  d. On February 12, 2020, two electronic payments from the Leominster Account 5848 to (i) "Health Connector Ins. Prem." account ending in "68" in the amount of $21.08

---

[5] Although many transactions appear to be similar types to those conducted in Santander Account 2734 prior to HOEY's arrest, there are also other transactions from the Leominster Account 8548 whose purpose is unknown at this time. For example, I do not know the purpose of payments to certain third parties out of the Leominster Account 8548 such as Barclays Card, Chase Card and American Express.

and (ii) "Health Connector Ins. Prem." account ending in "59" in the amount of $329.95. On January 24, 2020, two electronic payments from the Santander Account 2734 to (i) "Health Connector Ins. Prem." account ending in "68" in the amount of $21.58 and (ii) "Health Connector Ins. Prem." account ending in "59" in the amount of $330.45.

 e. On February 3, 2020, an electronic payment from the Leominster Account 8548 was made to "CitiBank" in the amount of $75. Records obtained from CitiBank show a payment to CitiBank Account ending in 3463, an account held in HOEY's name, for $75 on February 3, 2020.

 f. On February 7, 2020, a payment from the Leominster Account 8548 was made to "CitiBank" in the amount of $75. Records obtained from CitiBank show a payment to CitiBank Account ending in 5492, an account held in HOEY's name, for $75 on February 7, 2020.

45. After he was arrested on drug trafficking charges, HOEY withdrew the majority of funds from his account at TD AMERITRADE and an account was opened in his father's name at a new financial institution. Based on my training and experience, drug traffickers will often utilize bank accounts held in the name of a trusted third party in furtherance of their concealment activities.

46. Of the $87,180.82 in funds constituting the TD CHECK 5594-3 that was deposited into the Leominster Account 8548 on March 24, 2020, at least $10,000 is drug proceeds. HOEY transferred his drug proceeds through numerous financial accounts before they were finally deposited into the Leominster Account 8548:

 a. the money was deposited into Santander Account 2734;

    b. the money was transferred to and through TD Ameritrade Account 5882,

    c. the money was transferred to and through TD Ameritrade Account 4790,

    d. the money was transferred to and through TD Account 1248;

    e. the money was withdrawn as cash to purchase TD CHECK 3451-7, made payable to his father;

    f. the money was cancelled in TD CHECK 3451-7 and immediately used to purchase TD CHECK 5594-3, a new official check in the same amount, also made payable to his father; and, finally,

    g. the money was in TD CHECK 5594-3 and was deposited into the Leominster Account 8548 in his father's name.

HOEY seemingly gathered and then layered his drug proceeds into his Santander Account through multiple cash deposits in an attempt to conceal their true nature and origin. He then moved them throughout multiple financial institutions to further obfuscate where the funds originated. Then, after withdrawing the funds and converting them into check form, HOEY integrated his drug proceeds into his father's account as seemingly clean and untraceable money. Based on my training and experience, these actions are consistent with money laundering because I know that the numerous transfers of the funds for no apparent legitimate purpose, such as these, is consistent with an intent to conceal the nature, source, location, and ownership of the funds, including the $87,180.82 deposited into the Leominster Account. Accordingly, I have probable cause to believe that the TARGET FUNDS are also subject to forfeiture because they are involved in a money laundering offense in violation of 18 U.S.C. § 1956.

V. **CONCLUSION**

47. Based on the foregoing, I request that the Court issue the proposed seizure warrant.

*Andrew Snow*
Andrew Snow
Special Agent
Drug Enforcement Administration

Sworn to before me on this __1st__ day of ~~March~~ April, 2020 at __1:03__. A~~M~~/PM

Notice is hereby provided that, pursuant to Federal Rule of Criminal Procedure 4.1, the affiant was sworn and the contents of this affidavit subscribed to by telephone on the date and time indicated above and on the search warrant issued by the Court.

*David H. Hennessy*
Honorable David H. Hennessy
United States Magistrate Judge